## 0197

Wallace E. BUTLER, Jr., Appellant, v. SEA PINES PLANTATION COMPANY, Sea Pines Company, The Seabrook of Hilton Head, Inc., Sea Pines Montessori School, Inc., Plantation Cablevision, Inc., Sea Cabin Corporation, R. P. Crum, R. S. Crum, Virginia H. Crum, D. P. Schrader, D. L. Schrader, Roberta Nissi, as Trustee, Molly Kagen, Carl J. Kaimer, William Hunter, Sally Hunter, I. William Littell, and Teacor, Inc., d/b/a C and S Investment South, and Robert L. Kosnoski, Gerald Kosnoski, Carrol D. Simplins, Hulette C. Smith, Joseph B. Fraser, Jr., Piney Coking Coal Land Company, McCreery Coal Land Co., and Edward M. Payne, III, d/b/a Hilton Head Land Associates, and Les Austin and Sea Pines Plantation Co., Inc., d/b/a Austin Development Associates, and William B. Sherer, Jr., Roger Cawley, Evonne G. Cawley, and Opal S. Duke, d/b/a Goolagong's, Defendants, of whom Sea Pines Plantation Company, Sea Pines Company, The Seabrook of Hilton Head, Inc., Sea Pines Montessori School, Inc., Outdoor Recreation Services, Inc., and Les Austin and Sea Pines Plantation Co., Inc., d/b/a Austin Development Associates, are the remaining, Respondents.

(317 S. E. (2d) 464)

Court of Appeals

114

*McKay & Mullen*, Hilton Head Island, for appellant.

Charles A. Scarminach, Hilton Head Island, *Boyd, Knowlton, Tate & Finlay* and *James B. Richardson* of *Ham & Richardson*, Columbia, *Dowling, Sanders, Dukes, Novit & Svalina*, Beaufort, *for respondents.*

Heard Feb. 22, 1984.

Decided June 11, 1984.

SANDERS, Chief Judge:

Appellant Wallace E. Butler, Jr., sued to enjoin the development of a track of land on Hilton Head Island, South Carolina. Respondent Sea Pines Plantation Company holds title to a portion of the tract. Respondent Sea Pines Company owns the common stock of Sea Pines Plantation Company. The remaining respondents each own other portions of the tract. The trial judge dismissed the action. We affirm.

In 1961, Butler purchased a lot within Sea Pines Plantation, a residential subdivision on Hilton Head Island, from Sea Pines Plantation Company (Sea Pines).[1] He claims that as a result of certain unrecorded documents and alleged promises and representations made to him in connection with his pur-

---

[1] Butler has since transferred title to his sister-in-law in order to obtain continued homeowner's insurance which had been denied him. According to affidavits filed with this court, the property is being held in trust for Butler and his wife as beneficial owners.

chase, he acquired an easement or equitable servitude[2] in a 914-acre tract within the subdivision which now entitles him to an injunction restricting its use to that of a "forest preserve." In support of his claim, Butler relies on a "Master Plan" or map published by Sea Pines which purported to show future development of the subdivision. He further relies on certain promotional literature given to him by Sea Pines and a document entitled "Basic Data on Sea Pines Development" describing the concept and scheme for future development.

Finally, Butler relies on conversations which he had with the president of Sea Pines in which it was allegedly represented to him that the 914-acre tract would be maintained free of development as a "wildlife or forest preserve."

Butler purchased his lot by a contract of sale to which were attached (1) the restrictions applicable to the lot, (2) a plat of the street on which the lot was located and (3) the "Basic Data" document.[3]

The sales contract contained the following language:

> The Sea Pines Plantation Company, as Seller, makes no pledges, covenants or commitments in regard to the development of the Sea Pines Plantation Area except as stated in this Contract, the recorded covenants and the document entitled "Basic Data on the Sea Pines Development," dated _____ , a copy of which has been provided Buyer.

The Basic Data document referred to included the following provisions:

> The master plans for the development of Sea Pines Plantation and the land use controls incorporated into all deeds are the outgrowth of over five years of research and planning. . . .

---

[2] The only authority argued by Butler for the creation of an equitable servitude is C. Clark, *Real Covenants and Other Interests Which "Run With Land,"* ch. 6 (2d ed. 1947). Clark states equitable servitudes are encumbrances indistinguishable from negative easements. The analogy between the two being substantially complete, it is Clark's opinion that an equitable servitude should be treated in substance as an easement. *See* Clark at 176-177.

[3] Contrary to his testimony given at deposition, Butler argues a reduced master plan was also attached. Respondents deny this.

The basic concepts and ideas for the development which were formulated during this research, and which were implemented in the designs, are three-fold:

(1) All land is to be sold subject to complete deed restrictions to assure, with thorough enforcement by the resident ownership-management, that the homes and other structures constructed within Sea Pines boundaries are attractive in appearance and appropriate to their neighborhoods;

(2) The development was planned (and was underway on a massive scale by January 1960) of a full range of recreational, sporting and cultural facilities for year round residents and vacationers during the four seasons of the year, and

(3) *maintenance of at least two square miles of Sea Pines in a undeveloped condition, free of homes and any other buildings, and managed in a way designed to preserve the wildlife and the natural beauty of the area. ...*

The master land use plan and preliminary architectural plans for the clubs and similar structures *will be reviewed and modified from time to time* in accordance with suggestions of residents and the continuing research and design program of the company. *They are guides, not unchangeable designs,* and will be implemented within the overall pattern originally established, in a way responsive to the developing needs of the community. ... (Emphasis added.)

As indicated, master plans were subject to modification. The "Basic Data" document was itself revised almost annually while in use by the company. Neither the "Master Plan" nor the "Basic Data" document applicable at the time of Butler's purchase were recorded or referenced in his deed. Butler's general warranty deed, recorded in Beaufort County states:

... subject, however, to the rights, restrictions, conditions, etc. which constitute covenants running with the premises, all as set out or referred to and made applicable above, and the option described hereinabove.

None of the covenants, conditions, etc., referred to in the deed contain restrictions on the tract now in question. Neither the deed nor sales contract referenced a master plan.

The record reveals Butler was employed by Sea Pines as either a salesman or sales manager from 1958 to 1967. As such, he was familiar with the various versions of master plans and data documents. He testified he sold property in Sea Pines Plantation by reference to master plans which were displayed in the sales office. These plans designated an area of the Plantation as a wildlife preserve. However, Butler also testified he was aware from the outset of Sea Pines' policy of flexibility in master planning, as evidenced by the following language from the letter which offered him employment:

> The comments of visitors at the exhibits should be carefully noted and to the extent necessary plans and programs — plans and program policy revised to reflect consumer preferences. Ample opportunity should be provided to encourage visitors to sign up for any literature and brochures to be issued in connection with the public offering for property for sale in 1958. *The exhibits should be so displayed that the text will not commit the company at this stage in a precise pattern of development* leaving full flexibility for any program changes that may be necessary as a result of formation of a development syndicate and to take into the account new knowledge of consumer preferences. (Emphasis added.)

According to Butler, Charles Fraser, president of Sea Pines, made oral representations to him prior to his purchase that a specific contiguous two-square-mile tract (the property now in question) would be permanently set aside as a wildlife and forest preserve.[4] In addition, Butler testified that signs were posted around this tract indicating it was a wildlife preserve.

Butler further testified that as early as 1965 he was aware of development of property within the tract.[5] He was also aware that a proposed airstrip was designated within the tract. Butler testified he "commented" to some Sea Pines

---

[4] However, on cross-examination, Butler testified no oral representations were made concerning the sale of his lot and the only written representations were those contained in the land use restrictions document.

[5] Development is now quite extensive and includes condominiums, churches, office buildings, law offices, shops, restaurants, an art gallery, bank, medical clinic, savings and loan association and United States Post Office. Butler does not ask that these buildings be removed.

officials about possible violations of the master plan but lodged no formal or written complaints. He conceded he voiced no objections to some of the alleged violations. Butler admitted that during the mid-1960's he sold residential lots in the area he now claims as a preserve. As recently as 1978 he was involved in the sale of property within the tract.

Sea Pines admits it is contractually obligated to a two-square-mile commitment but contends the more than 1280 acres (two square miles) permanently restricted throughout the Plantation meets that obligation because there is no requirement the undeveloped land be a contiguous parcel. Fraser, president or chairman since 1957, testified Sea Pines' original acre-for-acre commitment language in a 1957 data document was later changed to a two-square-mile commitment, which in his opinion was approximately the same amount of property. Fraser also testified this commitment was being met in a series of steps involving various parcels of property. One of these was a 572-acre tract designated as Sea Pines Forest Preserve, with plat and covenants recorded in 1970 and revised in 1979 to increase the preserve to 605 acres.

Fraser further testified the two-square-mile commitment was incorporated into a contractually binding 1974 Property Owner's Agreement signed by a majority of the property owners, including Butler. In return for payment of higher assessments for community services, Sea Pines agreed, among other things, to irrevocably designate 1292 acres within the Plantation to be kept in an undeveloped condition free of homes and other structures. (Insufficient land had thus far been set aside to satisfy the two-square-mile commitment.) As a result of these agreements, a "Declaration of Covenants and Restrictions by Sea Pines Plantation Company, Inc." was recorded which designated the 1292 acres (including the 572-acre Sea Pines Forest Preserve) for use as conservancy and open space areas. According to testimony of Fraser and an employee in Sea Pines' land control department, the 1292-acre commitment has been far exceeded, with over 2,000 acres committed to wildlife preserves, parks and open spaces.

Fraser denied having told Butler exactly where the alleged two-square-mile parcel would be located and noted that the property now in question does not constitute two square

miles. He testified Butler was aware of the various changes to master plans and data documents and never voiced complaints about possible violations of master planning, in particular the two-square-mile commitment. He further testified that, prior to Butler's purchase, they even walked the location of a proposed airstrip within the tract while it was being cleared.

Restrictive covenants are to be strictly construed, with doubts resolved in favor of a free use of property. *Hamilton v. CCM, Inc.*, 274 S. C. 152, 263 S. E. (2d) 378 (1980); *Edwards v. Surratt*, 228 S. C. 512, 90 S. E. (2d) 906 (1956). An easement restricting the use of property must be created in express terms or by plain and unmistakable implication. *Hamilton.* In determining whether an easement exists, the language of the deed, the circumstances surrounding the origin of the covenants and the intent of the parties should be considered. *Hamilton; Bomar v. Echols,* 270 S. C. 676, 244 S. E. (2d) 308 (1978).

This being an action in equity, tried by a judge alone, this court has jurisdiction to find facts in accordance with its view of the preponderance of evidence. *Hamilton; Townes Associates, Ltd. v. City of Greenville*, 266 S. C. 81, 221 S. E. (2d) 773 (1976). Of course, we also review errors of law.

In the instant case, Butler argues an implied easement was created by representations and unrecorded documents. In our view, the preponderance of evidence supports the trial judge's finding that no oral commitments were made to Butler at the time he purchased his lot from Sea Pines. In addition, there is similar support for the findings that Sea Pines reserved its right to designate which land would fulfill the two-square-mile commitment and never intended or evidenced intent to permanently restrict any part of the tract other than the Sea Pines Forest Preserve. We find the data documents and sales contracts clearly stated master plans were not to be construed as permanent designations of property. Because neither the public documents presented in evidence or the circumstances surrounding the conveyance give rise to a "plain and unmistakable" implication, there can

be no easement restricting the use of the disputed tract. *See Hamilton.*[6]

Butler relies heavily on the cases of *Marshall v. Columbia and E. C. Electric St. Ry. Co.*, 73 S. C. 241, 53 S. E. 417 (1906) and *Epps v. Freeman*, 261 S. C. 375, 200 S. E. (2d) 235 (1973). Unlike the present case, neither of these involved the express reservation of rights to modify plans for future development. In *Marshall*, the purchaser had no notice as Butler did here that the developer intended to rely only on certain recorded documents. In fact, the trial judge there specifically found the developer had represented to the purchaser that certain property bordering her lots was dedicated to public uses and would be kept open. In addition, the deed there referenced a plat which showed both the purchaser's lots and the bordering property. *Epps*, argued as support for an easement created by estoppel, also stands for the proposition that an easement is created by a deed which references a plat containing representations of open areas. Here, Butler relies upon unrecorded documents, not representations of his plat.

In light of the above, we hold the trial judge did not err in concluding Butler had failed to establish the creation of an easement.[7]

As a second argument on appeal, Butler asserts the ■ trial judge erred in admitting into evidence an exhibit which was a summary of land use classification for Sea Pines Plantation accompanied by nine volumes of plats. Butler argues the summary consisted of prejudicial, self-serving, hearsay statements and was prepared after initiation of the suit, in anticipation of trial. He also questions the accuracy and sufficiency of the plats.

Testimony of Frank Guscio, one of the preparers of the exhibit, revealed that the nine volumes contained current

---

[6] Sea Pines also argues that under *Bomar, supra,* implied restrictive covenants create a reciprocal negative easement which, among other things, requires a common grantor. Because Fraser, not Sea Pines, held title to the tract now in dispute when Butler took title to his lot from Sea Pines, there was no common grantor.

[7] Having thus decided this issue on its merits, we need not address respondents' arguments that the action is barred by laches, estoppel, waiver and the statute of limitations. Nor is it necessary that we address the issue of notice of the alleged easement to subsequent purchasers.

plats recorded in the office of the Clerk of Court of Beaufort County. Because the parties had stipulated to the authenticity and admissibility of all copies of documents then of record in that office, we hold Butler waived any objection as to their admissibility.

Concerning the summary itself, Guscio testified it contained information which was part of Sea Pines' records. Counsel for respondents represented to the court that the land use classifications contained in the summary were derived from information on the accompanying plats and reflected only those uses shown there. The plats were recorded and certified and had been made available to opposing counsel in pre-trial discovery.

A summary of voluminous records prepared for use at trial is admissible if the records themselves are properly in evidence or made available to the adverse party. *Zemp Const. Co. v. Harmon Bros. Const. Co.*, 225 S. C. 361, 82 S. E. (2d) 531 (1954).

The admissibility of evidence is largely within the trial judge's discretion. His ruling will not be disturbed absent an abuse of that discretion. *Hook v. Rothstein*, 316 S. E. (2d) 690 (S. C. App. 1984). We hold the trial judge here did not abuse his discretion in finding the exhibit was not prejudicial and in admitting it into evidence.

Finally, Butler argues numerous rulings by the trial judge, when taken together, exhibit manifest bias and prejudice. In support of this allegation Butler contends the order itself shows the judge had made preconceived findings and ruled accordingly during trial. He further asserts, "On every conceivable issue in dispute the Judge ruled in favor of the Respondents."

Contrary to Butler's claim, the record is replete with rulings against respondents during trial. In any event, adverse rulings, even if erroneous, are insufficient to establish a trial judge's bias or prejudice. *Black v. Dahl*, 625 P. (2d) 876, 881 n. 9 (Alaska 1981) citing *State v. City of Anchorage*, 513 P. (2d) 1104 (Alaska 1973). The record must clearly show prejudice, bias, capricious disbelief or prejudgment. *In Re Archer's Estate*, 363 Pa. 534, 70 A. (2d) 857 (1950).

At no point prior to submission of the present case to the trial judge did Butler raise the issue of bias. Generally, where bias and prejudice of a trial judge is

claimed, the issue must be raised when the facts first become known and, in any event, before the matter is submitted for decision. *People v. Tappan*, 266 Cal. App. (2d) 812, 72 Cal. Rptr. 585 (1968). *Cf. State v. Loftin*, 278 S. C. 618, 300 S. E. (2d) 480 (1983) (allegation of prejudice on part of trial judge was not timely where it came after appellant's probation was revoked). Nor was a motion for disqualification or new trial ever made. *Cf. Lyvers v. Lyvers*, 312 S. E. (2d) 590 (S. C. App. 1984) (party seeking disqualification of judge under Canon 3(C)(1) of Code of Judicial Conduct must show some evidence of bias or prejudice). Therefore, Butler has waived the right to raise this issue on appeal. *Cf. Sanders v. Hayes*, 128 S. C. 181, 122 S. E. (2d) 572 (1924) and *Ex Parte Hilton*, 64 S. C. 201, 41 S. E. 978 (1902) (in both cases, parties knew judge was related to them but did not object and thus were found to have waived that issue on appeal).

However, we have carefully reviewed the record and have found no evidence of bias or prejudice on the part of the trial judge. To the contrary, we are impressed with the diligent manner in which he conducted the two-week trial involving a vast number of witnesses and exhibits.

Accordingly, the order of the trial judge is

Affirmed.

SHAW and BELL, JJ., concur.